People v Miller (2020 NY Slip Op 06667)





People v Miller


2020 NY Slip Op 06667


Decided on November 13, 2020


Appellate Division, Fourth Department


Troutman, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on November 13, 2020
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Fourth Judicial Department

PRESENT: SMITH, J.P., CURRAN, TROUTMAN, AND DEJOSEPH, JJ.


1039 KA 15-00477

[*1]THE PEOPLE OF THE STATE OF NEW YORK, RESPONDENT,
v
ANTHONY MILLER, DEFENDANT-APPELLANT. 






BRIDGET L. FIELD, ROCHESTER, FOR DEFENDANT-APPELLANT. 
SANDRA DOORLEY, DISTRICT ATTORNEY, ROCHESTER (SCOTT MYLES OF COUNSEL), FOR RESPONDENT. 


 Troutman, J.
 Appeal from a judgment of the Supreme Court, Monroe County (Thomas E. Moran, J.), rendered January 5, 2015. The judgment convicted defendant upon a jury verdict of robbery in the first degree. 
It is hereby ORDERED that the judgment so appealed from is reversed on the facts, the indictment is dismissed, and the matter is remitted to Supreme Court, Monroe County, for proceedings pursuant to CPL 470.45.
Opinion by Troutman, J.:
On appeal from a judgment convicting him upon a jury verdict of robbery in the first degree (Penal Law § 160.15 [4]), defendant contends that the verdict is against the weight of the evidence. We agree.
I
The evidence at trial established that a robbery occurred at approximately 8:00 p.m. on a chilly September evening at a location near Genesee Street in the City of Rochester. The perpetrator put a gun to the victim's head and stole a cell phone, a set of keys, a pack of cigarettes, and two $5 bills, none of which were ever recovered. The victim estimated that the entire encounter lasted approximately 30 to 45 seconds, after which the gunman ran south on Genesee Street. A second, larger man on a bicycle was in the vicinity at the time of the crime and, after approximately one minute, he left and traveled in the same direction as the gunman. The victim called 911, and a radio dispatch was broadcast at 8:02 p.m.
The dispatch was heard by a Rochester Police Department officer, who was driving a marked patrol vehicle southwest of the location of the robbery. The officer testified on direct examination that the initial dispatch described "two suspects, both male blacks [sic], one wearing a red hoodie, the other one with a gray hoodie, . . . one approximately five foot[ ]eight, maybe five foot[ ]nine, medium build." The officer knew the area and testified that "there's a lot of side streets, so at any point in time, they could have gone down any one of the side streets." The officer took one of those side streets. By doing so, he traveled north toward an intersection located approximately half a mile from the location of the robbery. The first people he saw on the street were, at 8:07 p.m., standing in the driveway of a house near the intersection and, according to the officer, they matched the description in the purported dispatch. However, on cross-examination, the officer admitted that the dispatch described only one suspect—a black man in a gray hooded sweatshirt and jeans, who was approximately 19 years of age. There was no credible evidence presented at any stage of these proceedings that anyone in a red sweatshirt was at any time reported to have been involved in the robbery.
One of the men standing in the driveway near the intersection was defendant. [*2]Defendant's height, which the jury was able to observe at trial, was listed in the presentence report as five feet, five inches. He was wearing a red hooded sweatshirt, baggy black pants, and unlaced tan boots, and was described as having a "chin-strap" beard. The other, much larger man was wearing a gray hooded sweatshirt. The officer exited his patrol vehicle and told the men to show their hands, whereupon he immediately frisked defendant's companion. While the officer was conducting that frisk, his partner arrived and frisked defendant. The officer asked the men where they were coming from and where they were going. Defendant stated that he had gone to the house to retrieve an mp3 player, but that no one was home. The officer thought that the explanation was suspicious because his partner found an mp3 player on defendant's person during the frisk. Thereafter, the victim indicated to an investigator that the gunman had a chin-strap beard, and that description was radioed to the officers who were with defendant. Concluding that defendant fit the description of the gunman, the officers transported him and his companion to the scene of the crime for a showup identification procedure. Upon seeing defendant, the victim identified him as the gunman, explaining that defendant must have changed his clothes. In addition, the victim identified defendant's companion as the man on the bicycle. Defendant was arrested and jailed.
The same night, the investigator asked for permission to search the residence of defendant's companion, which was located across the street from where defendant and his companion had been standing when they were first approached by the officer. After obtaining such permission, the investigator searched the residence for the fruits of the robbery, particularly the cell phone, or for a pair of jeans that would have fit defendant. The search turned up no evidence related to the robbery. The investigator on direct examination minimized his failure to find evidence inside the residence, explaining that it was a "very, very cursory search." However, on cross-examination, he was unable to provide a coherent explanation for why he did not search the residence more thoroughly. After the failed search of the residence, the investigator continued to search for the victim's cell phone using a global positioning system locator. Two days after the robbery, while defendant was still in jail, the investigator was able to track the phone to a location close to the scene of the crime, where a group of people had congregated. The police activated the phone's alarm and, when the alarm sounded, everyone in the group immediately fled. The phone was powered down shortly thereafter and never recovered. The trial testimony of the investigator also established that a police dog was able to track the scent of the fleeing gunman down Genesee Street, finally losing the scent at least one block south of where the gunman would have needed to turn in order to get to the place where defendant was found.
II
We have the power to review the factual findings of the jury and the obligation to do so at the request of the defendant (see People v Danielson, 9 NY3d 342, 348 [2007]; see also CPL 470.15 [5]). Our "unique factual review power is the linchpin of our constitutional and statutory design" (People v Bleakley, 69 NY2d 490, 494 [1987]) and is intended to afford every defendant at least one appellate review of the facts (see People v Kuzdzal, 31 NY3d 478, 486 [2018]; Bleakley, 69 NY2d at 494). In discharging our judicial obligations here, we conclude that, inasmuch as the only evidence linking defendant to the crime was the eyewitness identification by the victim, an acquittal would have been reasonable (see generally Bleakley, 69 NY2d at 495). Because an acquittal would have been reasonable, we "must, like the trier of fact below, 'weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony' " (id.). "If it appears that the trier of fact has failed to give the evidence the weight it should be accorded," we may set aside the verdict (id.; see CPL 470.20 [2]).
We start by considering the probative force of the eyewitness identification. It has long been understood that "the frequent untrustworthiness of eyewitness identification testimony" poses an "unusual threat to the truth-seeking process" because "juries unfortunately are often unduly receptive to such evidence" (Manson v Brathwaite, 432 US 98, 119-120 [1977, Marshall, J., dissenting]; see Felix Frankfurter, The Case of Sacco and Vanzetti: A Critical Analysis 99 [1927] ["What is the worth of identification testimony even when uncontradicted? The identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials."]). More recently, the Court of Appeals, relying on empirical evidence collected as a result [*3]of DNA exonerations, has recognized that "[m]istaken eyewitness identifications are 'the single greatest cause of wrongful convictions in this country' . . . , 'responsible for more . . . wrongful convictions than all other causes combined' " (People v Boone, 30 NY3d 521, 527 [2017]). Although we generally defer to the jury's determination with respect to the credibility of eyewitnesses (see Bleakley, 69 NY2d at 495), there are a number of cases where we and the other Departments of the Appellate Division, in exercising our obligation to review the factual findings of the jury, have found a verdict to be against the weight of the evidence where the only significant evidence against the defendant was an uncorroborated eyewitness identification of dubious reliability (see e.g. People v Mann, 184 AD3d 670, 671-672 [2d Dept 2020]; People v James, 179 AD3d 1095, 1096-1097 [2d Dept 2020], lv denied 35 NY3d 971 [2020]; see also People v Rodas, 76 AD2d 936, 937 [2d Dept 1980]; People v Gerace, 254 App Div 135, 135-136 [4th Dept 1938]).
Several factors call the reliability of this particular identification into question. One such factor is that showup identifications are inherently suggestive (see People v Ortiz, 90 NY2d 533, 537 [1997]; People v Crittenden, 179 AD3d 1543, 1543 [4th Dept 2020], lv denied 35 NY3d 969 [2020]; see also Jessica Lee, No Exigency, No Consent: Protecting Innocent Suspects From the Consequences of Non-Exigent Show-Ups, 36 Colum Hum Rts L Rev 755, 756 [2005]). Additionally, the reliability of an identification is affected where, as here, a gun is displayed, there is a high level of stress, the incident is brief, and the lighting is dim (see State v Henderson, 208 NJ 208, 261-264, 27 A3d 872, 904-906 [2011]; Nancy Franklin & Michael Greenstein, A Brief Guide to Factors That Commonly Influence Identification and Memory of Criminal Events, 85 NY St BJ 10, 12 [Mar./Apr. 2013]; see generally People v LeGrand, 8 NY3d 449, 456 [2007]).
On the other hand, there is considerable objective evidence supporting defendant's innocence. Defendant was found standing in a driveway half a mile from the crime scene only seven minutes after it occurred, wearing clothing different from the clothing worn by the gunman. He was not in possession of the fruits of the crime or of a firearm. There was no testimony that he was out of breath or that he displayed other signs of having recently run a distance. To the contrary, his boots were not even laced. The possibility that he changed clothes and hid the items in his companion's residence across the street was questionable in the first instance given the timing of the events, and was severely undercut by the fact that the police obtained permission to search the residence and did so without finding anything linking defendant to the crime. Furthermore, the police investigation established that a person other than defendant possessed the fruits of the robbery, particularly the victim's cell phone, and that person's act in fleeing from the police when the phone alarm sounded was indicative of consciousness of guilt (see People v Davis, 174 AD3d 1538, 1540 [4th Dept 2019], lv denied 34 NY3d 980 [2019]; People v Zuhlke, 67 AD3d 1341, 1341 [4th Dept 2009], lv denied 14 NY3d 774 [2010]). Other objective evidence, particularly the dog tracking, established that the gunman never turned west off of Genesee Street toward the place where defendant was found, but continued to run down Genesee Street in a southerly direction.
In sum, viewing the evidence in light of the elements of the crime as charged to the jury (see Danielson, 9 NY3d at 349), we conclude that the jury "failed to give the evidence the weight it should be accorded" (Bleakley, 69 NY2d at 495). Accordingly, we conclude that the judgment should be reversed and the indictment dismissed (see CPL 470.20 [5]; People v Marchant, 152 AD3d 1243, 1244 [4th Dept 2017]).
III
Finally, although defendant's contention that Supreme Court erred in refusing to suppress the showup identification is academic in light of our determination, we would be remiss in failing to admonish the court for its erroneous suppression ruling under the circumstances presented here. The court erroneously opined that it could not "dissect the minuscule, little things" that occurred during this street encounter and concluded that the officer was justified in "first, making an inquiry, second, detaining [defendant], and, thirdly, bringing him before the victim for the purposes of identification . . ." Not only was the court's interpretation of the facts contrary to the unequivocal testimony of the officer, which established that defendant was frisked before any inquiry was conducted, the court's explication of the applicable law was incorrect. It has been well established for more than four decades that, "in evaluating the legality of police conduct, we [*4]'must determine whether the action taken was justified in its inception and at every subsequent stage of the encounter' " (People v Burnett, 126 AD3d 1491, 1492 [4th Dept 2015]; see People v De Bour, 40 NY2d 210, 215 [1976]). Insofar as relevant here, a stop and frisk must be founded on a "reasonable suspicion that the particular person has committed or is about to commit a crime" (People v Benjamin, 51 NY2d 267, 270 [1980]; see Burnett, 126 AD3d at 1493). Although the general description of defendant for the most part "matched the description provided by the 911 dispatcher [i.e., he was a young black man of average height in a hooded sweatshirt], the court failed to give adequate consideration to the difference between the location where the dispatcher stated that the suspect[] had been observed running from the crime scene . . . and the location where the officer stopped defendant" (People v Spinks, 163 AD3d 1452, 1453 [4th Dept 2018]; cf. People v Carson, 122 AD3d 1391, 1392 [4th Dept 2014], lv denied 25 NY3d 1161 [2015]). The testimony of the officer who initiated this street encounter established that he explored only "one of" several side streets in a residential neighborhood and seized the first young black man in a hooded sweatshirt who he found. It must be plainly stated—the law does not allow the police to stop and frisk any young black man within a half-mile radius of an armed robbery based solely upon a general description.
Smith, J.P., and DeJoseph, J., concur with Troutman, J.; Curran, J., concurs in the result in the following Opinion:
I respectfully concur with the majority's decision to reverse the judgment and dismiss the indictment, albeit on a different basis. In my view, reversal is required here solely on the ground that Supreme Court erred in refusing to suppress the showup identification testimony because it was not sufficiently attenuated from the police officer's unlawful stop and detention of defendant (see People v Spinks, 163 AD3d 1452, 1454 [4th Dept 2018]; see also People v Ayers, 85 AD3d 1583, 1585 [4th Dept 2011], lv denied 18 NY3d 922 [2012]; People v Parris, 136 AD2d 882, 883 [4th Dept 1988], lv dismissed 71 NY2d 1031 [1988]). In my view, the exceedingly limited "information available to the detaining officer did not provide reasonable suspicion to stop and detain defendant" under the circumstances here (Spinks, 163 AD3d at 1453; see People v Nazario, 180 AD3d 1355, 1356 [4th Dept 2020]; People v Young, 202 AD2d 957, 957-958 [4th Dept 1994]).
I further conclude that, on this record, there is no reason for us to remit the matter for an independent source hearing, relief which I note the People have not requested. At trial, the victim testified that he did not previously know the person who robbed him, that the whole encounter lasted a brief 30 to 45 seconds, and that the robber pointed a gun at his head. Given that uncontested evidence, I conclude that the People could not meet their burden of establishing whether there existed an independent source for the victim's in-court identification of defendant. Indeed, any in-court identification could only be derived from the People's exploitation of the patently unlawful arrest (see People v Underwood, 239 AD2d 366, 367 [2d Dept 1997], lv denied 90 NY2d 911 [1997]; cf. Spinks, 163 AD3d at 1454).
Inasmuch as the identification evidence was the only evidence supporting defendant's conviction, granting suppression thereof in this case also requires dismissal of the indictment (see generally People v Lopez, 149 AD3d 1545, 1548 [4th Dept 2017]; People v Thompson, 127 AD3d 658, 659 [1st Dept 2015]). In light of that dispositive determination, I would not reach defendant's remaining contentions.
Entered: November 13, 2020
Mark W. Bennett
Clerk of the Court